Anne **BRUMBAUGH, et al., Plaintiffs**

v.

**WAVE SYSTEMS CORPORATION, et al., Defendants**

**No. CIV.A.04–30022–MAP.**

United States District Court, D. Massachusetts.

Jan. 11, 2006.

---

Stuart L. Berman, Schiffrin & Barroway LLP, Bala Cynwyd, PA, for Alvin Chess, Candy M. Sousa, H. Martin Bohman, Jack Schulman, Jimmy Suo, Michael Vicker, Rafat Dawod, Yosef Streicher, Consolidated Plaintiffs.

Michael D. Blanchard, Bingham McCutchen LLP—Hartford, Hartford, CT, for Wave Systems Corporation, Gerard T. Feeney, John E. Bagalay, Jr., Steven K. Sprague, Defendants.

Jeffrey C Block, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, for Candy M. Sousa, Plaintiff.

Robert A. Buhlman, Bingham McCutchen LLP, Boston, MA, for Wave Systems Corporation, Gerard T. Feeney, John E. Bagalay, Jr., Steven K. Sprague, Defendants.

Darren Check, Schiffrin & Barroway, LLP, Bala Cynwyd, PA, for Alvin Chess, Candy M. Sousa, H. Martin Bohman, Jack Schulman, Jimmy Suo, Michael Vicker, Rafat Dawod, Yosef Streicher, Consolidated Plaintiffs.

Nancy F. Gans, Moulton & Gans, PC, Boston, MA, for Candy M. Sousa, Ron Rogers, Steve Alvarez, Plaintiffs.

Peter A. Lagorio, Gilman and Pastor, LLP, Saugus, MA, for Candy M. Sousa, Alvin Chess, H. Martin Bohman, Jack Schulman, Jimmy Suo, Michael Vicker, Rafat Dawod, Yosef Streicher, Consolidated Plaintiffs.

Eunice E. Lee, Bingham McCutchen LLP, Boston, MA, for Wave Systems Corporation, Gerard T. Feeney, John E. Bagalay, Jr., Steven K. Sprague, Defendants.

John C. Martland, Martland & Brooks LLP, Saugus, MA, for Anne Braumbaugh, Gary L. Harmon, Randy K. Griffin, Plaintiffs.

David Pastor, Gilman and Pastor, LLP, Boston, MA, for Candy M. Sousa, Alvin Chess, H. Martin Bohman, Jack Schulman, Jimmy Suo, Michael Vicker, Rafat Dawod, Yosef Streicher, Anne Braumbaugh, Gary L. Harmon, Randy K. Griffin, Plaintiffs.

Karen Reilly, Schiffrin & Barroway, LLP, Radnor, PA, for Anne Braumbaugh, Gary L. Harmon, Randy K. Griffin, Plaintiffs.

Raquel J. Webster, Bingham McCutchen LLP, Boston, MA, for Wave Systems Corporation, Gerard T. Feeney, John E. Bagalay, Jr., Steven K. Sprague, Defendants.

Marc I. Willner, Schiffrin & Barroway, LLP, Radnor, PA, for Anne Braumbaugh, Gary L. Harmon, Randy K. Griffin, Plaintiffs.

Jean Marc Zimmerman, Zimmerman, Levi & Korsinsky, LLP, Westfield, NJ, for Candy M. Sousa, Plaintiff.

## MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS

(Docket No. 58)

PONSOR, District Judge.

### I. INTRODUCTION

This is a class action brought by Plaintiffs on behalf of all persons who acquired the common stock of Wave Systems Corporation ("Wave" or "the Company") between July 31, 2003 and December 18, 2003, allegedly misled by nine misrepresentations that violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and Rule 10b–5.[1] Defendants are Wave, its President and Chief Executive Officer, Steven K. Sprague, and its Senior Vice President, Chief Financial Officer and Secretary, Gerard K. Feeney;[2] they have moved to dismiss the consolidated amended complaint on numerous grounds. In particular, Defendants maintain that: (1) the allegedly misleading statements are not actionable as a matter of law; (2) the facts pled do not give rise to a strong inference that Defendants acted with the requisite scienter; and (3) the complaint fails to allege a causal connection between the alleged misrepresentations and the stock's subsequent depreciation. For the reasons set forth below, the court will allow Defendants' Motion to Dismiss as to two of the statements challenged and deny the motion as to the other seven.

---

1. No motion for class certification has yet been filed, and no class has yet been certified. When such a motion is filed, the parties will need to address the issues raised in two recent First Circuit decisions: *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1 (1st Cir.2005), and *In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (2005).

2. Plaintiffs concede that John E. Bagalay, Jr. was not properly named as a defendant. To make sure the record is clear, the court hereby dismisses all claims against John E. Bagalay, Jr.

## II. FACTUAL AND PROCEDURAL BACKGROUND

"Where the dismissal is grounded in Rule 12(b)(6), the facts pled in the complaint are taken in the light most favorable to the plaintiff." *In re Cabletron Sys., Inc.,* 311 F.3d 11, 22 (1st Cir.2002). The following is a summary of the facts presented in this light.[3]

Since its inception in 1988, Wave, a self-described "development stage company," had never managed to market any of its digital security services or technologies successfully. (Dkt. No. 55, Consolidated Am. Compl. ¶ 2.) By December 31, 2002, the Company found itself over $230 million in debt and in need of $11 million in cash to continue operations in 2003.

With no major revenue source in sight, the Company was forced to close a private placement of Series H Stock on April 30, 2003. (*Id.* at ¶ 4.) Although this private investment in the publicly held Company resulted in net proceeds of $4,465,571, the placement terms, from Wave's perspective, were quite onerous. (*Id.*) Not only did they restrict the Company's capacity to generate additional funds through future equity offerings by giving the Series H shareholders a right of first refusal, they also required Wave to pay significant dividends to these preferred shareholders. (*Id.*) Because the Company lacked the resources to redeem the preferred stock or pay the dividends, Wave's status as a going concern seemed to rest on the automatic conversion of these preferred shares to Class A Common Stock. Under the terms of the placement, such a conversion could only occur if the closing bid on Wave's stock exceeded $1.90 for fifteen of twenty consecutive trading days. (*Id.* at ¶ 5.) With the stock consistently trading at under $1.00 per share in the Spring of 2003, it appeared unlikely this condition would be met.

On May 15, 2003, the Company issued a press release in which Sprague stated that "key industry participants are finally beginning to recognize the value Wave can add and are evaluating ways that they can work with us to benefit from our position." (*Id.* at ¶ 26); *see also id.* ("This is an exciting time for us, as we begin to see our long-held vision of revenue-producing trusted computing services become an expected reality.")

In its Form 10–K/A filed with the Securities and Exchange Commission ("SEC") on June 30, 2003, Wave expanded on Sprague's optimistic assessment by forecasting $5 million in sales based upon "the anticipation that various deals we are working on will close." (*Id.* at ¶ 34 (noting the Company's continuing efforts to "solidify[ ] strategic alliances with the major personal computer manufacturers to force collaborative efforts to distribute its products to consumers").)

On July 31, 2003, with the market primed to expect a substantial revenue stream, the Company issued a press release, announcing an agreement with Intel Corporation that would "enable Intel to bundle Wave's software and services with a future Intel desktop motherboard." (*Id.* at ¶ 36.) Although the terms of the deal were not disclosed (*id.* at ¶ 38 (citation omitted)), Wave's stock soared and closed that day at $2.25 per share, a gain of 168% from the day before (*id.* at ¶ 37).

The Company's stock was still on the rise when, on August 4, 2003, Wave announced a partnership with IBM destined to "significantly help us in our objective to

---

**3.** Many of the facts will be taken verbatim from *Sachs v. Sprague,* 401 F.Supp.2d 159 (D.Mass.2005). Because identical allegations sit at the core of the two cases, there is no need to alter significantly the factual recitation.

deliver open and interoperable solutions to business customers." (*Id.* at ¶ 42.) Once again, despite the fact that the deal's terms were undisclosed (*id.* at ¶ 46 (citation omitted)), the market reacted positively, and Wave's stock closed at $4.42 per share, up $.77 per share from its previous closing price (*id.* at ¶ 44).[4]

On August 11, 2003, Wave filed the first of four filings with the SEC in which the Company characterized its recent deals with Intel and IBM as "Material Changes." (*Id.* at ¶¶ 55, 61–63.) Three days later, during a conference call with analysts, Sprague finally revealed that the Intel deal was a non-exclusive licensing agreement with no minimum licensing requirements. (*Id.* at ¶ 58.) Sprague also admitted that although the Company's products were compatible with IBM's, Wave did not have a licensing agreement with the computer giant. (*Id.*)

Despite these revelations, Wave's CEO stood by the Company's earlier predictions of significant revenue growth. (*Id.*) Pressed to indicate the source of his sanguinity, Sprague conveyed his belief that the "relationship ... with Intel and the business model that was articulated in the press release" would be the primary basis for revenue Wave would see by the end of the fourth quarter. (*Id.*) When asked whether Wave could "keep the lights on until this unfolds," Sprague stated that "we've been much more comfortable than perhaps our shareholders can be because it's hard to see the data that we have. But we're very comfortable." (*Id.* at ¶ 59.)

In the meantime, on August 5, 2003, Feeney sold 100,000 shares of the Company's stock for $500,000, reducing his over-

all share ownership by 50%. (*Id.* at ¶ 49.) The next day, Sprague himself sold 150,-000 Wave shares for $533,841, cutting his overall share ownership by 20%. (*Id.* at ¶ 50.) These sales caught the spike in Wave's stock value at $3.14–$5.00 per share. (*Id.* at ¶ 75.)

On August 20, 2003, in a Form S–3 Registration Statement, Wave characterized its "partnership" with IBM as a "licensing agreement." (*Id.* at ¶ 62.) Two days later, on August 22, 2003, the Company again described its relationship with IBM as a "licensing agreement" in a prospectus filed with the SEC. (*Id.* at ¶ 63.)

On September 16, 2003, Wave disclosed that it had successfully modified the conditions of the April Series H Placement. (*Id.* at ¶ 65.) Among other concessions, the Series H holders agreed to curtail significantly their right of first refusal, increasing the Company's capacity to generate additional funds through future equity offerings. (*Id.*)

In a press release dated November 13, 2003, Sprague stated: "We can now clearly see the growing momentum for trusted computing in the marketplace, and we expect substantial growth in volumes over the course of the next four quarters." (*Id.* at ¶ 68.) Six days later, Wave announced that it had secured $7.1 million from a private placement financing. (*Id.* at ¶ 69.)

In December 2003, the SEC commenced an investigation relating to "certain public statements made by Wave during and around August 2003, as well as certain trading in Wave's securities during such time." (*Id.* at ¶ 70.) After Defendants disclosed this news in a press release dated December 18, 2003,[5] the Company's

---

**4.** On August 5, 2003, a Company spokesperson told the *New York Times* that "IBM computers with built-in Wave security would be available in the fourth quarter of this year." (*Id.* at ¶ 45 (citation omitted).)

**5.** This disclosure came after the close of the market.

shares fell 17%, closing at $1.50 the following day. (*Id.* at ¶ 72.)

In February 2004, eight individual Plaintiffs filed putative class actions.[6] Based on counsel's representations, this court ordered the eight cases consolidated on September 3, 2004.[7] Plaintiffs subsequently filed their two-count amended complaint, alleging violations of: "Section 10(b) of the Exchange Act and Rule 10b–5 Promulgated Thereunder" by "All Defendants" (Count I); and "Section 20(a) of the Exchange Act" by "the Individual Defendants" (Count II).

The crux of Plaintiffs' complaint is that Defendants' efforts to inflate the Company's stock artificially caused them harm. They allege that as Wave stood on the brink of extinction, Defendants made a series of misrepresentations that led reasonable investors to believe the Company was poised to fulfill its recent predictions of unprecedented revenue growth. In short, Plaintiffs submit that by concealing the true nature of the purported Intel and IBM deals, Defendants perpetrated a fraud on the market.

### III. *DISCUSSION*

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b) (2005). Rule 10b–5, promulgated by the SEC pursuant to Section 10(b), "forbids, among other things, the making of any 'untrue statement of material fact' or the omission of any material fact 'necessary in

order to make the statements made … not misleading.'" *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, ——, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005) (citing 17 C.F.R. § 240.10b–5 (2004)). Although the statute does not expressly allow for private claims, *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 358, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), *superseded on other grounds by statute,* Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, § 476, 105 Stat. 2236, 2387, *as recognized in Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.,* 129 F.3d 222, 224 (1st Cir.1997), the private cause of action has become an "essential tool for enforcement of the 1934 Act's requirements," *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

In order to state a 10b–5 claim, a plaintiff must allege a(1) false statement or omission of material fact, (2) with scienter, (3) upon which plaintiff relied, and (4) which caused plaintiff's injury. *See Gross v. Summa Four Inc.,* 93 F.3d 987, 992 (1st Cir.1996), *superseded on other grounds by statute,* Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 737, *as recognized in Greebel v. FTP Software, Inc.,* 194 F.3d 185, 197 (1st Cir. 1999).

In addition to pleading these basic elements, a plaintiff must also comply with the standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4 (2005). Among other things, the PSLRA requires a plaintiff to

**6.** A ninth case, *Trebitsch v. Wave Systems Corp.,* 04–266–JCL, was originally filed in the District of New Jersey before being transferred to this court.

**7.** The seven other cases are: *Streicher v. Wave Systems Corp.,* C.A. 04–30026–MAP; *Dawod v. Wave Systems Corp.,* C.A. 04–30029–MAP;

*Chess v. Wave Systems Corp.,* C.A. 04–30037–MAP; *Vicker v. Wave Systems Corp.,* C.A. 04–30040–MAP; *Boham v. Wave Systems Corp.,* C.A. 04–30041–MAP; *Suo v. Wave Systems Corp.,* C.A. 04–30042–MAP; and *Schulman v. Wave Systems Corp.,* C.A. 04–30043–MAP.

identify each allegedly misleading statement and explain why it is misleading. 15 U.S.C. § 78u–4(b)(1). The PSLRA also provides that a plaintiff must allege facts "giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added).[8]

"This last requirement alters the usual contours of a Rule 12(b)(6) ruling because, while a court continues to give all reasonable inferences to plaintiffs, those inferences supporting scienter must be strong ones." *Cabletron,* 311 F.3d at 28; *see also Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 78 (1st. Cir.2002) ("Even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter.").

### A. *Specific Misrepresentations and/or Omissions.*

Cognizant of the strictures of the PSLRA and Fed.R.Civ.P. 9(b), Plaintiffs allege that Defendants made nine specific misrepresentations in press releases, a conference call, an interview, and filings with the SEC.

### 1. *Press Release of July 31, 2003.*

■ The complaint avers that a Wave press release dated July 31, 2003, announced an agreement between the Company and Intel that would "enable Intel to bundle Wave's software and services with a future Intel desktop motherboard." (Am. Compl. ¶ 36.) Obviously, this allegation satisfies the "who, what, and where" mandates of the PSLRA and Rule 9(b). *See Fitzer v. Sec. Dynamics Tech., Inc.,* 119 F.Supp.2d 12, 18 (D.Mass.2000). Close analysis also reveals that a factfinder could conclude that this allegation satisfies all four elements of 10b–5 claim: material omission, scienter, reliance, and causation.[9]

### a. *Omission of a Material Fact.*

■ Plaintiffs contend that this press release was "materially false and misleading" in light of information it failed to disclose. (Am. Compl. ¶ 41.)[10] To fulfill the materiality requirement there must be "a reasonable likelihood that a reasonable investor would consider [the information

---

**8.** While the First Circuit's application of Fed. R.Civ.P. 9(b) in pre-PSLRA securities actions was "congruent and consistent" with the standards set forth in § 78u–4(b)(1), *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 193 (1st Cir.1999), "pre-Act case law" in this Circuit "had used both the language of 'strong' inference and of 'reasonable' inference," *id.* at 197 (noting the use of "reasonable inference" language in *Gross v. Summa Four Inc.,* 93 F.3d 987, 996 (1st Cir.1996); *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1224 (1st Cir. 1996); *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 368 (1st Cir.1994); *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir.1992); and *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991)).

**9.** Detailed discussion of the four elements as regards the July 26, 2003 press release will permit a shorter analysis of the other eight alleged misrepresentations.

**10.** Defendants' preliminary argument that the press release was literally accurate overlooks the fact that literal accuracy "does not preclude liability under federal securities laws." *Lucia· v. Prospect St. High Income Portfolio, Inc.,* 36 F.3d 170, 175 (1st Cir.1994). As the First Circuit recognized in *Lucia:*

> Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.

*Id.* (quoting *McMahan v. Wherehouse Entm't, Inc.,* 900 F.2d 576, 579 (2nd Cir.1990)).

omitted] important." *Glassman v. Computervision Corp.*, 90 F.3d 617, 632 (1st Cir.1996) (citations omitted).

If, as Plaintiffs allege, the press release came on the heels of previous disseminations by Defendants forecasting unprecedented sales—in "anticipation that various deals that we are currently pursuing will close"—the terms of the Intel agreement "would have assumed actual significance in the deliberations of a reasonable shareholder," *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and "significantly altered the 'total mix' of information made available," *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978 (citing *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126).

■ The argument that Defendants had no affirmative duty to disclose the terms of the Intel agreement lacks merit. By volunteering "relevant, material information" regarding the lucrative nature of impending agreements, Defendants assumed an obligation, in announcing Wave's new relationship with Intel, to convey "the whole truth." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir.1987); *see also Gross*, 93 F.3d at 992 (While "a corporation does not commit securities fraud merely by failing to disclose all nonpublic material information in its possession," a duty to disclose "may arise if, *inter alia*, a corporation has previously made a statement of material fact that is ... incomplete ... or misleading in light of the undisclosed information."); *In re Allaire Corp. Sec. Litig.*, 224 F.Supp.2d 319, 327 (D.Mass.2002) ("[H]aving elected to comment on financial and product sales performance, [the company]

was required to make full and accurate disclosures.").

■ Equally unpersuasive is Defendants' contention that they cannot be held liable for statements merely of corporate optimism. "The corporate puffery rule applies to loose optimism about both a company's current state of affairs and its future prospects." *Fitzer*, 119 F.Supp.2d at 23. While courts continue "to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace," *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996), *superseded on other grounds by statute as recognized in Greebel*, 194 F.3d at 197, the recent trend is to consider expressions of corporate optimism carefully.[11]

*In re No. Nine Visual Tech. Corp. Sec. Litig.*, 51 F.Supp.2d 1 (D.Mass.1999), adopted the following analytical approach to claims of puffery. First, the court

consider[s] whether the statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information; second, the court ... ask[s] whether the statement was also considered unimportant to the total mix of information by the market as a whole.

*Id.* at 20 (citations omitted).

Applying *No. Nine*'s test, this court finds that: (1) a reasonable investor, cognizant of Defendants' recent prophecy of "strategic [and profitable] alliances with the major personal computer manufacturers," would not have considered the announcement of one such alliance to be so

---

11. "[I]t has been said that the 'puffing' concept in the securities context has all but gone the way of the dodo." 69A Am.Jur.2d *Securities Regulation–Federal* § 1118 (2005) (citation omitted). This observation may be somewhat hyperbolic. *See Orton v. Parametric*

*Tech. Corp.*, 344 F.Supp.2d 290, 301 (D.Mass. 2004) (finding comment that company was "position[ed] ... for long-term growth" a "classic example of non-actionable corporate puffery"). Still, dismissals on this ground are increasingly rare.

vague, so general, or so loosely optimistic as to be unimportant to the total mix of information; on the contrary, a reasonable investor would have seen an "agreement" enabling "Intel to bundle Wave's software and service with a future Intel desktop motherboard" as a major source of Wave's previously projected revenue; and (2) the market as a whole considered the Intel announcement quite important to the total mix of information. (*See* Am. Compl. ¶ 37 (noting that on July 31, 2003, the volume for Wave's stock was "approximately 19 million shares traded, as compared to Wave's average daily volume of only 199,-136 shares").)

■ Defendants next argue that the Intel press release was "forward-looking" and therefore subject to the "Safe Harbor" clause of the PSLRA. Under that provision, a "forward-looking" statement is not actionable if: (1) the statement is "identified as ... forward-looking ... and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially ...; or" (2) it is "immaterial; or" (3) "the plaintiff fails to [plead] that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(A)–(B); *see also Greebel,* 194 F.3d at 201 (recognizing that the statute is disjunctive, providing "safe harbor" via "alternative inlets").

There are several problems with this contention. First, "the subject matter of the alleged misrepresentation[ ]"—the terms of the Intel agreement—"was a matter of fact rather than conjecture by the time the statement[ ] w[as] made. Thus,

the statement[ ] cannot be characterized as forward-looking, and the safe harbor provision of the PSLRA does not apply." *In re Sepracor, Inc. Sec. Litig.,* 308 F.Supp.2d 20, 28 (D.Mass.2004).

■ Assuming *arguendo* that the statement in question was "forward-looking," Defendants "boilerplate" disclaimer at the close of the press release was "not sufficiently detailed to fall within the protections of the 'bespeaks caution' doctrine." *In re Focus Enhancements, Inc. Sec. Litig.,* 309 F.Supp.2d 134, 162 (D.Mass.2001).

■ In their disclaimer, Defendants noted that the following factors could cause the Company's performance "to be materially different" from that "implied" by the press release: (1) "general economic and business conditions," (2) "the ability to fund operations," (3) "the ability to forge partnerships required for deployment," (4) "changes in consumer and corporate buying habits," (5) "chip development and production," (6) "the rapid pace of change in the technology industry," and (7) "other factors over which Wave Systems Corp. has little or no control." [12]

Among these factors, only the second and third—the ability to "fund operations" and "forge partnerships" required for deployment—relate even tangentially to the subject matter of the press release. While one could conclude that these factors put prospective investors on notice that the announced partnership with Intel might not lead to the deployment of Wave products, this court must draw its inferences in Plaintiffs' favor. *In re Credit Suisse First Boston Corp.,* 431 F.3d 36, 45 (1st Cir. 2005) (citing *In re Colonial Mortgage*

---

**12.** (Dkt. No. 72, App. Supp. Defs.' Mot. Dismiss, Ex. 5.) Defendants have submitted copies of the relevant press releases, conference call transcript, and SEC filings in conjunction with their motion to dismiss. Because Plaintiffs have admitted the authenticity of these documents, this court may consider them in ruling on Defendants' 12(b)(6) motion. *See Watterson v. Page,* 987 F.2d 1, 4 (1st Cir. 1993).

*Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)).

In drawing such inferences, the most the court can conclude is that the cautionary language warned that Wave's agreement with Intel was not exclusive. It did not counter sufficiently the strong implication that the Intel partnership would lead to substantial deployment and thus, a significant revenue stream. *See Shaw* 82 F.3d at 1213 (noting how the "surrounding context" failed to caution "against such an implication with sufficient clarity to be thought to bespeak caution").

Ultimately, because "reasonable minds could ... disagree as to whether the *mix* of information in the [allegedly actionable] document is misleading," the first prong of the statutory safe harbor provision cannot "provide[ ] basis for dismissal as matter of law." *Id.* at 1214 (citation omitted).

▇▇▇ As for the third prong,[13] Defendants note that the "actual knowledge" required is a higher level of scienter than the "recklessness" required by the PSLRA, *see Greebel*, 194 F.3d at 201; thus, they contend that allegations that satisfy 15 U.S.C. § 78u–4(b)(2) do not, *ex proprio vigore*, satisfy 15 U.S.C. § 78u–5(c)(1)(B).

The problem with this argument is that it fails to account for the different procedural stages the respective provisions were designed to address. Whereas Section 78u–4(b)(2) specifies the requirements for a "complaint," Section 78u–5(c)(1)(B) states what a plaintiff must "prove" in order for a defendant to be found "liable."

Mindful of the First Circuit's consistent position "that the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence," *Cabletron*, 311 F.3d at 33; *see also In re Credit Suisse First Boston Corp.*, 431 F.3d at 46 ("[A] pleading setting forth a section 10(b) claim need not ... elaborate upon every jot and tittle of evidentiary detail."); *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir.1998) ("[W]e ... cannot expect plaintiffs to plead 'fraud with complete insight' before discovery is complete."), the court must conclude that Plaintiffs' allegations of "actual knowledge" are sufficient to preclude safe harbor access via this final "alternative inlet."

b. *Scienter.*

▇▇▇ Having established that the Intel press release omitted a material fact, the court must now consider the question of scienter. "In order to prevail in a 10b–5 action, a plaintiff must show that defendants had ... the 'intent to deceive, manipulate, or defraud.'" *Geffon v. Micrion Corp.*, 249 F.3d 29, 35 (1st Cir.2001) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Scienter, in this case, may be established by showing that Defendants knowingly or recklessly issued the materially misleading press release. *See Aldridge*, 284 F.3d at 82; *see also Greebel*, 194 F.3d at 198 (defining the recklessness required as "a highly unreasonable omission, involving ... an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is ... so obvious the actor must have been aware of it").

▇▇ In making the scienter determination, a court must evaluate "the totality of the circumstances." *Crowell v. Ionics*,

---

**13.** Defendants wisely concede the inapplicability of the second prong—the materiality of the press release (*see* Dkt. No. 70, Defs.' Reply Mem. Supp. Mot. Dismiss 3)—for it would strain credulity to suggest that investors who flocked to Wave's stock in the wake of the Intel press release did not consider the information it conveyed significant to the total mix.

*Inc.,* 343 F.Supp.2d 1, 13 (D.Mass.2004) (citing *Cabletron,* 311 F.3d at 40). The First Circuit has "considered many different types of evidence as relevant to show scienter," *Greebel,* 194 F.3d at 196 (citations omitted), and has permitted plaintiffs to "combine various facts and circumstances indicating fraudulent intent," *Aldridge,* 284 F.3d at 82; *see also Cabletron,* 311 F.3d at 40 (noting that while "[e]ach individual fact about scienter may provide only a brushstroke," the "resulting portrait" can meet the "strong inference" requirement).

 Ultimately, "[i]nferences must be reasonable and strong—but not irrefutable.... Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder." *Aldridge,* 284 F.3d at 82 (citing *Helwig v. Vencor, Inc.,* 251 F.3d 540, 553 (6th Cir.2001)).

In light of these standards, the facts pled clearly give rise to a strong inference that Defendants intended to perpetrate a fraud on the market when they issued the Intel press release. In support of this conclusion, two factors are particularly significant: (1) Defendants' "motive and opportunity" to inflate Wave's stock artificially; and (2) Sprague and Feeney's insider sales.

Defendants assert that *Greebel* established a rule in this circuit "that an alleged motive and opportunity, without more, cannot establish a strong inference of scienter." [14] In fact, *Greebel* explicitly rejected the argument that "facts showing motive and opportunity can never be enough to permit the drawing of a strong inference of scienter"—a determination recognized and reiterated by subsequent First Circuit

opinions. *See, e.g., Cabletron,* 311 F.3d at 39 (citing *Greebel,* 194 F.3d at 197).

While *Greebel* did make clear the insufficiency of "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme," 194 F.3d at 197 (citation omitted), this is not a case where Defendants merely had the common motive to promote corporate success "possessed, to a certain degree, by every corporate officer," *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1116 (D.Nev. 1998). On the contrary, the complaint paints the picture of a company nearly a quarter billion dollars in debt and so desperate for cash it would agree to private placement terms onerous enough to bring it to the proverbial brink. *(See* Am. Compl. ¶¶ 3–7.)

In short, Defendants had "more than the usual concern by executives" to increase the value of Wave's stock; "the executives' careers and the very survival of the company were on the line." *Cabletron,* 311 F.3d at 39; *see also Aldridge,* 284 F.3d at 83 ("When financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter."); *Greebel,* 194 F.3d at 196 (citation omitted) (recognizing the relevance of "the self-interested motivation of defendants in the form of saving their salaries or jobs").

Even where dire circumstances alone might fall short of what the PSLRA and Rule 9(b) require, allegations of insider trading "provide additional ballast to [Plaintiffs'] argument for scienter." *Cabletron,* 311 F.3d at 40. Here, Defendants aver that under *Greebel,* "mere pleading of insider trading ... is not enough." 194

---

**14.** *(See* Dkt. No. 59, Defs.' Mem. Supp. Mot. Dismiss 37 (citing *Greebel,* 194 F.3d at 197); Dkt. No. 70, Defs.' Reply Mem. Supp. Mot.

Dismiss 20 ("Allegations of motive and opportunity ... are *never enough* by themselves to create a strong inference of scienter.").)

F.3d at 198 (citation omitted). They maintain that allegations of insider sales by Sprague and Feeney are inconsequential in light of Plaintiffs' failure to illustrate how such sales were "unusual, well beyond the normal patterns of trading by those defendants." *Id.*

If Plaintiffs, in seeking to establish scienter, relied solely upon the insider sales in question, their failure to illustrate how such sales were inconsistent with past trading practices might be fatal. *See Focus Enhancements,* 309 F.Supp.2d at 162 (citation omitted). However, as previously discussed, Plaintiffs' allegations of insider trading are ancillary in nature. They buttress allegations concerning Defendants' motive and opportunity, and Plaintiffs' "case becomes ... stronger ... when the allegations are considered together." *Crowell,* 343 F.Supp.2d at 16 ("The way in which the allegedly fraudulent acts fit together and reinforce one another strongly suggests a conscious course of conduct.").

In *Greebel,* the court began by examining the context of the alleged insider sales. Because none of the "key players" sold stock "at the high points of the stock price," but instead "waited to sell until after ... an announcement which caused the price of the stock to fall," the *Greebel* court determined that the timing of the sales in question was not suspicious. 194 F.3d at 206.

In contrast, Sprague and Feeney's sales occurred after an announcement that caused the price of the stock to *rise* and came at a time when they possessed material non-public information. Consequently, the timing of such sales might be viewed as quite suspicious.

Defendants maintain that the Wave stock Sprague and Feeney *did not sell* rebuts any inference that they were out to capitalize on an inflated price. They cite *In re Advanta Corp. Sec. Litig.,* 180 F.3d

525 (3rd Cir.1999), a case where the Third Circuit found that holdings retained by inside sellers suggested "they had every incentive to keep [the company] profitable." *Id.* at 541. Unfortunately for Defendants, the holdings retained by Sprague and Feeney—80% and 50%, respectively—pale in comparison to those retained by the *Advanta* insiders. *See id.* at 540 (noting insiders retained 95% and 93%, respectively, of their total holdings).

Accordingly, this court concludes that Plaintiffs have satisfied the PSLRA's scienter requirement.

c. *Reliance.*

 As the First Circuit recently observed, "[r]equiring proof of individualized reliance ... would effectively preclude securities fraud class actions." *In re Xcelera.com Sec. Litig.,* 430 F.3d 503, 506 (1st Cir.2005).

> To avoid this result, the Supreme Court has recognized the fraud-on-the-market theory, which relieves the plaintiff of the burden of proving individualized reliance on a defendant's misstatement, by permitting a rebuttable presumption that the plaintiff relied on the "integrity of the market price" which reflected that misstatement.

*In re PolyMedica Corp. Sec. Litig.,* 432 F.3d 1, 6 (1st Cir.2005).

Defendants argue that the market price for Wave's stock did not reflect any alleged misstatements. They point out that when Sprague told analysts that the Intel deal was a non-exclusive licensing agreement, "the market's reaction, as reflected by Wave's stock price, was virtually nonexistent." (Dkt. No. 70, Defs.' Reply Mem. Supp. Mot. Dismiss 1 (noting "a mere two cent (0.6%) difference from the day prior to the disclosure to the day after").) Since "the concept of materiality

translates into information that alters the price of the firm's stock," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3rd Cir.1997), *cited with approval in PolyMedica*, 432 F.3d at *13, Defendants maintain that the terms of the Intel agreement were immaterial as a matter of law. Consequently, their argument runs, Plaintiffs are not entitled to the presumption of reliance the "fraud on the market" theory affords. *See Basic*, 485 U.S. at 248 n. 27, 108 S.Ct. 978 (finding that "in order to invoke the presumption, a plaintiff must allege" among other things, "that [Defendants'] misrepresentations were material").

The flaw in this argument is that it focuses on Sprague's "disclosure" in isolation. During the conference call with analysts, Sprague did acknowledge that neither of the Company's new partners was obligated to purchase or use any Wave products or services. However, Sprague subsequently predicted that Wave's relationship with Intel would soon be a significant revenue source and indicated that Wave insiders were "very comfortable" about the Wave's capacity to continue operations until significant revenue arrived.[15]

Drawing "all reasonable inferences from the particular allegations in [Plaintiffs'] favor," *Aldridge*, 284 F.3d at 78, this court must conclude that Sprague's "disclosure" came in the midst of additional misrepresentations designed to maintain the Company's artificially inflated value. Conse-quently, the market's quiescence following the August 14th conference call does not preclude a presumption of reliance.[16]

### d. *Loss Causation.*

 Recently, the Supreme Court established that defrauded investors must do more than allege that "the price of the security on the date of purchase was inflated because of [a] misrepresentation." *Dura*, 125 S.Ct. at 1629 (citation omitted). To withstand a motion to dismiss, they must also plead actual economic loss and proximate causation.

Defendants contend that these plaintiffs, like those in *Dura*, have not done so. Once more, their argument is unavailing.

In *Dura*, the Court found that the complaint alleged

> the following (and nothing significantly more than the following) about economic losses attributable to [Defendants'] misstatement: "In reliance on the integrity of the market, [Plaintiffs] ... paid artificially inflated prices for [Defendants'] securities" and ... suffered "damage[s]" thereby.

*Id.* at 1630.

Here, Plaintiffs claim that Defendants artificially inflated Wave's stock during the class period by: (1) failing to disclose material information about the Company's relationship with Intel; and (2) making numerous misrepresentations regarding the

---

**15.** Defendants stress that the comfort Sprague expressed did not concern "any forecast regarding revenue or Intel.... Rather, the quoted comments were simply about whether the Company would be able to stay in business to see any potential benefits from recent developments in the market." (Dkt. No. 70, Defs.' Reply Mem. Supp. Mot. Dismiss 7–8.) Defendants may ultimately persuade the factfinder that this interpretation is more compelling, but a finding could as easily be made that the comments regarding "recent developments" were themselves materially misleading. *Cf. Swack v. Credit Suisse First Boston*, 383 F.Supp.2d 223, 240 (D.Mass. 2004) (refusing to dismiss in light of finding that "Defendants' conduct could have tempered a drop in price that would otherwise have occurred").

**16.** Defendants may seek to rebut this presumption at the class certification stage where the dictates of *PolyMedica* and *Xcelera.com* will control.

likelihood that this relationship would fulfill Defendants' earlier predictions of a significant revenue stream. (Am. Compl. ¶ 11–12 (alleging "Defendants pumped up the value of the Company's stock though materially false and misleading statements," which "caused Wave's stock to skyrocket" from "$0.84 per share" to "$4.42 per share").)

Next, Plaintiffs allege that news of an SEC investigation relating to Defendants' misleading statements "shocked the market, with shares falling 17.13%, or $0.31 per share, to close at $1.50 per share . . . on December 19, 2003." (*Id.* at ¶ 13.)

The complaint thus "contains the very allegations regarding share price decrease and public exposure to the truth the Supreme Court found lacking in the *Dura* complaint." *In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1025 (S.D.Cal. 2005).

Defendants contend that Wave's disclosure of the SEC investigation was not an admission that earlier statements were materially misleading.[17] While this may be so, *Dura* does not require that a corrective disclosure precede a stock's decline. 125 S.Ct. at 1631, 1632 (discussing the implications of stock's initial inflation "before the relevant truth begins to *leak out*"

and "after the truth *makes its way into the market place*") (emphasis added).[18]

Ultimately, the duration of the class period may make it difficult for Plaintiffs to *prove* that Defendants' misrepresentations caused their economic loss. *See id.* at 1632 ("[T]he longer the time between purchase and sale, the more likely . . . [it is] that other factors caused the loss."). However, in light of *Dura*'s acknowledgment that Fed.R.Civ.P. 8(a)(2) applies to the pleading of economic loss and proximate causation, this court must conclude that Plaintiffs have furnished Defendants "with some indication of [their] loss and the causal connection that [they have] in mind." *Id.* at 1634.

### 2. *August 4, 2003, IBM Press Release.*

▮ In a press release issued on August 4, 2003, Wave stated that its "partnership with IBM will significantly help us in our objective to deliver open and interoperable solutions to business customers." (Am. Compl. ¶ 42.) This statement is actionable for it has "an aspect that encompasses a representation of present fact." *Shaw*, 82 F.3d at 1213; *see also No. Nine*, 51 F.Supp.2d at 19 (holding that when Plaintiffs "challenge the truthfulness of a claim regarding *present facts*" the "'be-

---

17. (Dkt. No. 79, Defs.' Mot. Supplemental Authority 4.) Defendants also submit that, during oral argument, "this court recognized the absence of any necessary casual link between any allegedly misleading statements and Wave's drop in stock price following the announcement of the SEC investigation in December, 2003." (*Id.* at 3 n. 1 (citing Dkt. No. 75, Tr. Hr'g 24).)

It should come as no surprise that "[m]any judges use oral argument as an opportunity . . . to focus the argument, or to test the extreme implications of a litigants position. A court speaks authoritatively, however, only in its opinions, orders, and judgments." *Mgmt. Inv. Funding Ltd. v. Merrill Lynch, Pierce*, 2000 WL 145461, at *5 n. 6 (S.D.N.Y.

2000), *rev'd on other grounds by* 232 F.3d 153 (2nd Cir.2000); *see also Graphic Arts Intern. Union, Local 97–B v. Haddon*, 489 F.Supp. 1088, 1094 (D.C.Pa.1979) ("Assuming a devil's advocate role is a familiar ploy of the neutral decision-maker.").

18. *See also* Evan R. Chesler & J. Stephen Beke, *Loss Causation Post–Dura*, 1517 Practicing L. Inst. Corp. L. & Prac. Handbook Series 1277, 1282 (2005) ("*Dura* . . . did not purport to address whether plaintiffs in misrepresentation and omission cases . . . need explicitly allege that the subject matter of the alleged misrepresentations or omissions was revealed to the market by way of some 'corrective disclosure' . . . .").

speaks caution' defense is inapplicable"). It is also materially misleading in that it failed to disclose facts that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978 (citing *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126).

### 3. *August 5, 2003, New York Times Article.*

 On August 5, 2003, Plaintiffs allege that "a Wave spokesperson confirmed and furthered the market's perception of the Company's materially misleading August 4th announcement" by informing the *New York Times* that "IBM computers with built-in Wave security would be available in the fourth quarter of [2003]." (Am. Compl. ¶ 45.)

Defendants maintain that they cannot be held liable for a statement made by a reporter in an independent newspaper. In *Cabletron*, however, the First Circuit determined that

> [L]iability may attach to an analyst's statements where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the analysts to a significant degree.

311 F.3d at 37–38 (citing *Schaffer v. Timberland Co.*, 924 F.Supp. 1298, 1310 (D.N.H.1996)). The *Cabletron* court subsequently provided the following example of an allegation that satisfied "the entanglement test":

> the complaint alleges that an analyst report ... stated, on the basis of information from [an individual defendant] and other [company] executives, that the [product] would "ship in volume in the second week of April."

*Id.* at 38. Due to the high degree of similarity between this allegation and the one in question, the court concludes that statements made in the *New York Times* article are actionable.

### 4. *August 11, 2003, Form S–3/A.*

 Plaintiffs allege that statements in the Company's Form S–3/A dated August 11, 2003, describing Wave's purported deals with Intel and IBM as "material changes" were materially false and misleading. (Am. Compl. ¶ 56.) In response, Defendants point to express disclaimers that accompanied these statements, entitling them to safe harbor protection. (*See* Dkt. No. 59, Defs.' Mem. Supp. Mot. Dismiss 17; Dkt. No. 70, Defs.' Reply Mem. 16.) The problem with this contention has already been noted: because the terms of the Intel and IBM deals were matters of historical fact by the time Form S–3/A was filed, the statements in question cannot be construed as forward-looking, and the PSLRA's safe harbor provision does not apply. *See In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005), *reh'g denied by* 424 F.3d 24 ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement."). Thus, the court concludes the challenged statements are actionable.

### 5. *August 14, 2003, Conference Call.*

As previously discussed, the court deems actionable comments made by Sprague during the conference call with analysts concerning the likelihood that Wave's relationship with Intel would soon be a significant revenue source and the comfort level of Wave insiders as to the Company's capacity to continue operations until significant revenue arrived. *Cf. Sepracor*, 308 F.Supp.2d at 34 (finding state-

ments could not be "deemed mere puffery" when allegations raised "strong inference that Defendants were aware of, or recklessly disregarded, undisclosed facts tending to seriously undermine the accuracy of any predictions").

### 6. *August 18, 2003, Prospectus.*

■ On August 18, 2003, Defendants again characterized the Intel and IBM deals as "material changes" in a prospectus filed with the SEC. This characterization, Plaintiffs maintain, was materially false and misleading. (Am. Compl. ¶ 64.) The court disagrees and concludes the statements in question are not actionable. By August 18, 2003, the market was aware that Wave's Intel agreement lacked a minimum licensing requirement, and its IBM deal was not fee producing. Consequently, a reasonable investor would not have placed any significance on the allegedly "withheld or misrepresented information." *Basic*, 485 U.S. at 240, 108 S.Ct. 978.

### 7. *August 20, 2003, Form S–3 Registration Statement.*

■ Plaintiffs challenge a statement in the Form S–3 Registration Statement filed by the Company on August 20, 2003, characterizing the IBM "partnership" as a "licensing agreement." (Am. Compl. ¶ 62.) This allegation stands in contrast to previous ones in that Plaintiffs claim the statement is not merely incomplete but false. (*Id.* at ¶ 64.)

At first blush, this allegation appears "more quibble than material." *In re PLC Systems, Inc. Sec. Litig.*, 41 F.Supp.2d 106, 119 (D.Mass.1999). It is difficult to discern how a reasonable investor might differentiate news of a non-exclusive licensing agreement with no minimum licensing requirements from an announcement of product compatibility. That being said, "[t]he materiality of a given statement" is generally regarded in this circuit as " 'a question of fact that should … be left to a jury rather than resolved by the court on a motion to dismiss.' " *In re PerkinElmer, Inc. Sec. Litig.*, 286 F.Supp.2d 46, 52 (D.Mass.2003) (citing *Cabletron*, 311 F.3d at 34). The court thus concludes that this statement, as part of the basis for Plaintiffs' claims, is sufficient to survive the motion to dismiss.

### 8. *August 22, 2003, Prospectus.*

■ Similarly actionable is Defendants' alleged representation of the IBM compatibility as a "licensing agreement" in a prospectus filed by the Company on August 22, 2003.

### 9. *November 13, 2003, Press Release.*

■ Finally, Plaintiffs contend that statements made by the Company in a press release issued November 13, 2003, purporting to "clearly see the growing momentum for trusted computing in the marketplace" and conveying expectations of "substantial growth"

> were materially false and misleading at the time they were made. Defendants knew that the Company's prospects for growth were no more clear than they were at the onset of the Class Period.

(Am. Compl. ¶ 68.) The November press release is a clear case of puffery. The statements in question are "so vague [and] so lacking in specificity … that no reasonable investor could find them important to the total mix of information available." *Shaw*, 82 F.3d at 1217. Accordingly, the November 13, 2003 press release cannot provide the basis of any claim.

### B. *Pleading of Individual Defendants' Liability.*

Since a majority of the actionable statements were issued by Wave, Plaintiffs have clearly set forth a claim against the

Company that satisfies the dictates of Rule 9(b) and the PSLRA. *See Cabletron,* 311 F.3d at 40 ("The scienter alleged against the company's agents is enough to plead scienter for the company.")

■ As for Sprague and Feeney, the complaint alleges that each "held positions that would have given them not only access to, but close familiarity with, the details of [Wave's] affairs." *PerkinElmer,* 286 F.Supp.2d at 54–55. At all relevant times, Sprague served as the Company's President and Chief Executive Officer, and Feeney as Wave's Chief Financial Officer. (Am. Compl. ¶¶ 20, 21.)

■ Plaintiffs also contend that Sprague himself made several statements deemed actionable, and that both individuals sold significant amounts of Wave stock while in possession of material non-public information. Finally, both Sprague and Feeney signed SEC filings containing statements deemed to be actionable. *See Cabletron,* 311 F.3d at 41.[19] Based on the foregoing, the court finds that the complaint adequately states a claim of securities fraud against the individual defendants.

### C. *Rule 20(a).*

■ Section 20(a) of the Securities Exchange Act of 1934 provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such con-

trolled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*In re Stone & Webster, Inc., Sec. Litig.,* 424 F.3d 24, 26 n. 1 (1st Cir.2005) (quoting 15 U.S.C. § 78t–1(a)). Having determined that Plaintiffs have sufficiently pled a violation of Rule 10b–5, the court must now ask whether Sprague and Feeney "actually exercise[d] control over the company." *Aldridge,* 284 F.3d at 85

Ordinarily, "[c]ontrol is a question of fact" not to be "resolved summarily at the pleading stage." *Cabletron,* 311 F.3d at 41 (citation omitted). The present case affords no reason to deviate from this standard practice as Defendants' entire Rule 20(a) argument rests upon the premise that Plaintiffs inadequately pled an underlying predicate violation. Because Defendants' motion to dismiss the Rule 10b–5 claim will be denied, at least in part, Plaintiffs' cause of action against Sprague and Feeney for control person liability remains viable. *Stumpf v. Garvey,* No. 03–cv–1352–PB, 02–MDL–1335–PB, 2005 WL 2127674, at *13 n. 16 (D.N.H. Sept.2, 2005).

### IV. *CONCLUSION*

For the reasons set forth above, Defendants' Motion to Dismiss is hereby ALLOWED as to Statements 6 and 9 and DENIED as to Statements 1–5 and 7–8.

Of course, finding allegations sufficient to withstand a motion to dismiss is far cry from finding Defendants liable. *See Serabian v. Amoskeag Bank Shares, Inc.,* 24

---

**19.** The complaint alleges that Sprague and Feeney signed Wave's Form 10–K/A filed with the SEC on June 30, 2003, but does not explicitly allege that the individual defendants signed any other SEC filings. "A court may, however, in evaluating ... allegations [in a complaint,] look to documents the authentici-

ty of which are not disputed by the parties, to documents that are central to the plaintiff's claim, and to documents that are referenced in the complaint." *Garvey v. Arkoosh,* 354 F.Supp.2d 73, 79 (D.Mass.2005) (citing *Watterson,* 987 F.2d at 3).

F.3d 357, 365–66 (1994), *superseded on other grounds by statute as recognized in Greebel*, 194 F.3d at 197 ("Despite our conclusion that certain allegations survive threshold consideration, we note that plaintiffs remain a great distance from actually proving securities fraud."). This court's conclusion that Plaintiffs' Rule 10b–5 and Section 20(a) "claim[s] survive[ ] a motion to dismiss is only that. The defendants may yet prevail once the facts of the case are further developed." *Aldridge*, 284 F.3d at 84.

The clerk will set the case for a Rule 16 conference to establish a schedule for completion of all pre-trial proceedings.